(Nos. 31008, 31009.—

AMERICAN STEEL FOUNDRIES, Appellant, *vs.* ROBERT L. GORDON, Director of Labor, *et al.*, Appellees.

*Opinion filed Sept. 22, 1949—Rehearing denied November 21, 1949.*

OEHMKE & DUNHAM, (JAMES H. BANDY, of counsel,) both of East St. Louis, for appellant.

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and JAMES C. MURRAY, all of Chicago, of counsel,) for appellee the Director of Labor.

ARTHUR J. GOLDBERG, and ABRAHAM W. BRUSSELL, (GOLDBERG, DEVOE & BRUSSELL, of counsel,) all of Chicago, for other appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

These appeals present for decision the construction of section 7(d) of the Unemployment Compensation Act (Ill. Rev. Stat. 1947, chap. 48, par. 223,) which, to the extent relevant, ordains, "An individual shall be ineligible for benefits— * * * (d) For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed."

On November 10, 1948, a judgment of the circuit court of Madison County confirmed a decision of the Director of Labor finding Andrew Cole and Ann L. Turnbull eligible for benefits under section 7 (d) for the period from March 7 to 21, 1946, inclusive, and quashed and dismissed the complaint filed by their employer, the American Steel Foundries, under the Administrative Review Act. A like judgment order was entered the same day by the circuit court of St. Clair County finding Jethro Brown and Joe Rasinski eligible for unemployment compensation benefits for the same period. The employer has prosecuted two separate appeals. The causes were consolidated for argument and opinion.

The plaintiff, the American Steel Foundries, owns and operates large plants at Granite City and East St. Louis for the production of specialty steel castings and similar products. In early 1946, its physical equipment at Granite City, housed in fifteen buildings, occupying fifty acres, consisted of almost one thousand units of machinery. Among the most important units housed in the buildings were three large open-hearth furnaces, ovens, electric locomotives, derricks, cranes, air hammers, and sand clinkers, powered by electricity, steam or air. In January, 1946, approximately 1,400 production and maintenance workers, in addition to office, clerical and supervisory workers, were employed at

the plant. The plant at East St. Louis occupies an area of twenty acres, about forty per cent of which is under roof. Approximately 1200 production workers were employed at this plant.

The operation of the plants depended principally upon the successful operation and functioning of the furnaces. Proper operation of the furnaces required that they be brought to their maximum heat capacity progressively by slow degrees. From eight to ten days were required to reheat a furnace after it had been permitted to cool.

The claimants in No. 31008, Andrew Cole and Ann Turnbull, and Jethro Brown and Joe Rasinski in No. 31009, had been employed by plaintiff prior to January 21, 1946, and were members, respectively, of the United Steel Workers of America, Local No. 1063 and Local No. 1038, the collective bargaining units for all production and maintenance workers at the plants in Granite City and East St. Louis. The unions called a strike at both plants, effective January 21, 1946. Arrangements were made between the unions and the company's management for the "shut down" of the plants and for their maintenance during the time of the "shut down." Heat was withdrawn from the furnaces, equipment and machinery of all kinds were partially dismantled, greased and otherwise prepared against deterioration from non-use, utility services were disconnected, and power and water, except as necessary for maintenance, were withdrawn. Because of the cold weather, extra precautions were necessary to protect the plants and their contents against the results of rust and idleness. All manufacturing operations came to a complete halt on January 21, 1946.

On March 6, 1946, the company and the unions reached an agreement settling the labor dispute and ending the strike. The company immediately made arrangements to re-open its plants. Equipment which had been dismantled

required repairing because of the rapid deterioration occasioned by the cold weather and accumulation of dust in the shops. The company called all its foremen together and, with them and representatives of the employees, made plans for the manpower necessary to put all the equipment in shape, and to ready and open departments as needed to resume operations. Pursuant to these plans, employees were called in for repairs and restoration and for manning the departments first necessary in the chain of production. The reconditioning of the plants was all done by mutual agreement and arrangement between the company and representatives of the unions. Admittedly, it was neither reasonable nor physically possible to put the plants in condition for normal operations before March 21, 1946.

Production and maintenance workers made claims for benefits under the Unemployment Compensation Act for an initial period of two days, January 14 and 15, 1946, and a second period from January 21 to March 7, 1946. The four claimants who are appellees here also made claims for the period from March 7 to 21, inclusive. A deputy of the Division of Placement and Unemployment Compensation held the employees ineligible for benefits during the first two periods but that the claimants were eligible for the third period. Appeals from both the ineligible and the eligible determinations were taken by the employees affected and the company, respectively. The appeals were heard together by a representative of the Director of Labor who made a single report, recommending that the determinations of the deputy be affirmed. By his finding of fact No. 6, he specifically found that the unemployment for the period from March 7 to 21, 1946, was not due to a stoppage of work because of a labor dispute at the premises of the company during this period. He summarized the facts, in part, as follows: "The labor dispute, despite its settlement, continued to remain the sole cause of the work stoppage which persisted after March 6, 1946. Re-

heating the furnaces, one of many acts required to restore the plant to working order, alone necessitated eight to ten days, which, with greater speed, would expose these extremely expensive furnaces to risk of severe damage. A multitude of remaining units of machinery and equipment, by the joint effort of management and the Union, were restored to normal operative condition as rapidly as possible under existing · conditions. Production and maintenance personnel were recalled as speedily as conditions warranted. In fact, it is not claimed nor urged by the Union that the Company negligently failed or wilfully refused to reach more quickly a condition of normal operations. In all, it appears clear that the Company exerted its maximum efforts following the settlement of the dispute to restore the plant to operative condition, leaving nothing undone nor erroneously done, 'which could be chargeable with the continued work stoppage after March 6, 1946. The labor dispute alone remained exclusively the cause of the continuing work stoppage." The representative concluded that, under section 7(d) of the Unemployment Compensation Act, the labor dispute and the stoppage of work must coexist before benefits will be denied and, accordingly, that, for want of a labor dispute after March 6, 1946, the claimants should not be deemed ineligible for benefits.

The Director of Labor, by his decision, affirmed the deputy's determination and confirmed, adopted and made a part of his decision the entire report of his representative and specifically held that claimants were eligible for benefits under the statute from March 7 to 21, 1946, inclusive, and, conversely, not ineligible for such benefits for this period under the provisions of section 7(d).

Thereafter, the plaintiff company instituted this proceeding in the circuit court of Madison County under the Administrative Review Act to review the director's decision in favor of claimants Cole and Turnbull. The Director

of Labor filed the original transcript of determinations and proceedings as his return. The circuit court, as related, confirmed the decision, and an appeal followed.

The factual situation in No. 31009 relative to the strike of the company's plant in East St. Louis, the administrative proceedings resulting in the allowance of benefits to claimants Brown and Rasinski, the judgment of the circuit court of St. Clair County, and the company's appeal to this court are parallel with the corresponding facts, administrative and judicial proceedings, and the appeal in No. 31008.

The ineligibility portion of section 7(d) has not previously been construed by this court. In ascertaining the intention of the General Assembly in enacting this and other statutory provisions, courts have recourse not only to the language used in the particular statute, but, also, to the reasons motivating its' enactment, the purpose to be accomplished, and the evils, if any, to be remedied. (*Moyer* v. *Board of Education,* 391 Ill. 156.) To determine this intent, it is necessary to read an act in its entirety. A sentence, paragraph or a section of an act, viewed apart from its surrounding context, may appear to have one meaning, whereas on reading it with the entire act, a different intent is readily appreciated. *Crouch* v. *Murphy,* 390 Ill. 112.

The Unemployment Compensation Act is an exertion of the police power of the State. Statutes of this character enacted in the interest of the public welfare and providing for the assistance of the unemployed are liberally interpreted to the end that their basic purposes may be achieved. ·(*Zelney* v. *Murphy,* 387 Ill. 492; *Lindley* v. *Murphy,* 387 Ill. 506; *Zehender & Factor, Inc.* v. *Murphy,* 386 Ill. 258; *Oak Woods Cemetery Ass'n* v. *Murphy,* 383 Ill. 301.) "The liberal rule of construction," however, "only requires that a statute be so enforced as to carry into effect the will of the legislature as expressed in the terms thereof." (25 R.C.L., Statutes, p. 1076.) It is not within the province of an administrative agency or court to take from or

enlarge the meaning of a statute by reading into it language which will, in the opinion of either, correct any supposed omission or defects. (*Carnegie-Illinois Steel Corp.* v. *Review Board,* 117 Ind. App. 379, 72 N.E. 2d 662.) In particular the purpose of the Unemployment Compensation Act, as section 1 proclaims, is the relief of hardship caused by involuntary unemployment, only. Stated differently, where the unemployment of claimants for benefits results from their voluntary idleness, they fail to meet the test of involuntary unemployment. (*Local Union No. 11* v. *Gordon,* 396 Ill. 293; *Caterpillar Tractor Co.* v. *Durkin,* 380 Ill. 11.) A labor dispute includes a strike, and one who strikes becomes voluntarily unemployed. (*Walgreen Co.* v. *Murphy,* 386 Ill. 32.) As aptly observed in *Fash* v. *Gordon,* 398 Ill. 210, "if a labor dispute results in the employer closing his plant or factory the statute does not place the blame, but considers such unemployment caused by a labor dispute, and therefore not involuntary unemployment."

Recourse to section 7(d) discloses that, although the statute specifically prescribes that an individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at his place of employment, the statute does not also require that the labor dispute which caused the stoppage still exist or be in active progress. In other words, neither the "stoppage of work" nor the resultant ineligibility is limited in its duration by the duration of the "labor dispute," so long as the "stoppage of work" continues, as the statute says, "because of a labor dispute." Section 7(d) is sufficiently clear, and it is only when a tortuous construction is sought to be applied to the plain words clearly stated that ambiguity results and construction is required.

To sustain their position that workers unemployed, although willing to work, after peaceful settlement of a labor dispute, are involuntarily unemployed, within the con-

templation of section 7(d), claimants maintain that, in order. to render them ineligible to benefits, it is essential the labor dispute and the stoppage of work both exist during any week in which it is claimed that employees are ineligible for benefits. We are of the opinion that a literal reading of section 7(d) impels the opposite conclusion.

The ineligibility portion of section 7(d) cannot be isolated from the other provisions of the act and construed alone and apart from them. Section 7 contains eight provisions for the disqualification of claimants under certain circumstances, irrespective of their compliance with conditions precedent set forth in section 6. Claimants assert that the language employed in paragraphs (a), (b) and (c) shows a specific legislative intent to disqualify a claimant during a specific number of weeks after the week in which a given objective situation takes place. Paragraphs (d) and (h) do not contain a like provision. Section 7 contains two categories of disqualification. The first three paragraphs, (a), (b) and (c), comprise one category in which a claimant is disqualified for a specifically described delinquency and for a stated number of weeks thereafter. Paragraph (a) is illustrative: "For the week in which he has left work voluntarily without good cause and the three weeks which immediately follow such week." Paragraphs (d) and (h) fall in a separate category which comprises disqualification for so long as the claimant is in a work stoppage existing because of a labor dispute, or he causes himself to be unavailable for work. Differentiation of the reasons for disqualification and provisions for different consequences in paragraph (a), (b) and (c) from those in paragraphs (d) and (h) do not support the argument that the labor dispute and work stoppage must be concurrent or even, as claimants declare, that unemployment arising from a strike is the "most culpable form" of unemployment.

Our conclusion is supported by *Saunders v. Maryland Unemployment Compensation Board,* —. Md. —, 53 Atl.

2d 579. There, an employee of Bethlehem Steel Company claimed benefits for the period immediately following the conclusion of a strike and the time when his department at the plant had been readied for and resumed normal operations. Holding the claimant ineligible for benefits for this interval under section 5(d) of the Unemployment Compensation Law of Maryland, identical with section 7(d) of our Unemployment Compensation Act, the court observed, "The wording of the Maryland statute is so plain that there seems to be no room for fanciful or theoretical construction. The existing cause must be a labor dispute at the place where the claimant was last employed. It is significant that the Act does not refer to a labor dispute 'existing' at the time of employment. [Citation] Thus it appears that the labor dispute may be over as it was in the case before us, but the stoppage of work still may exist because of the aftermath of that labor dispute. It does not seem to us that the Legislature could have intended anything else in view of the words it used. The question presented, therefore, is whether the work stoppage for the week following the strike was the result of that strike or did it result from some other cause."

Another parallel case is *Carnegie Illinois Steel Corp.* v. *Review Board*, 117 Ind. App. 379, 72 N.E. 2d 662. The ineligibility section of the Indiana statute is also identical with section 7 (d) of the Illinois act. In the Indiana case, the claimants sought benefits for the period immediately following the termination of a strike and settlement of a labor dispute and during the time necessary to repair and recondition the employer's steel works in order to render the facilities ready for production. The Review Board of the Employment Security Division allowed the claims, and the employer appealed. Observations of the Appellate Court of Indiana in holding the claimants ineligible for benefits are singularly applicable to the two factual situations before us: "The word 'because' in the statute means 'by reason of.' The legislature intended to disqualify workers

for benefits where the stoppage of work was caused by a labor dispute under the conditions set forth in Sec. 7(f)(3) of the Act, even though such stoppage and dispute were not concurrent. The stoppage of work may exist during the week for which benefits are claimed, but not necessarily during the existence of the labor dispute. It is reasonable to assume that if the legislature had intended the stoppage of work and labor dispute had to exist at the same time, it would have so stated in the Act. * * * The only factors which could have caused the stoppage of work as shown by the record were the conditions in the plant which existed because of the shut-down of the plant by reason of the labor dispute, and the time necessary to repair coke ovens, the hearths of blast furnaces, and other repair items necessary before production could be resumed after the shut-down. We hold that the Review Board was in error, in its conclusion, that the unemployment following the settlement of the labor dispute and resulting from this fact, was not due to a stoppage of work caused by a labor dispute. We further hold that considering the legislative history of employment security acts, and the provisions of the Indiana Employment Security Act, and the Section in question, Section 7(f)(3), and the legislative intention as expressed in the terms of the Act, that the Review Board was in error in concluding that a stoppage of work must exist at the same time, or concurrently, before a worker is disqualified."

A pertinent administrative ruling by the Administrator of Veterans' Affairs is found in RAR-U-417. The claimants, employees of American Steel Foundries, who were veterans of World War II, sought benefit allowances under the Servicemen's Readjustment Act of 1944, (38 U.S.C.A. 693) for the period between March 7, 1946, the day on which the strike or labor dispute was settled, and the day normal production was resumed. Section 800(b) of this act is almost identical with section 7(d) of our Unem-

ployment Compensation Act. The claims were allowed by the Director of Labor of this State. Upon appeal by the employer to the Administrator, conformably to the Federal statute, the Administrator denied the claims, saying: "The Act does not require or imply that the labor dispute and the stoppage be concurrent. The relationship of the dispute to the stoppage is essentially causal rather than contemporaneous. The termination of the dispute need not and often does not result in the termination of the stoppage of work caused hereby. Since a substantial work stoppage may continue regardless of an employer's efforts to resume full scale operations, the termination of the disqualification of a claimant is measured by the cessation of the stoppage of work which is because of a labor dispute rather than by the cessation of the labor dispute which caused the stoppage of work. The claimants are, therefore, subject to the disqualifying provisions of section 800(b) during the periods that their unemployment was due to the stoppage of work which existed because of the labor dispute in the factories, establishments, or premises where they were last employed."

Each of the three authorities analyzed holds that, under provisions identical with or substantially the same as those of section 7 (d) of the Illinois statute, the ineligibility of a claimant for unemployment compensation benefits does not automatically terminate upon the settlement of the labor dispute or strike and, conversely, where the stoppage of work continues to exist as a necessary aftermath of the labor dispute, as here, the claimants' ineligibility for benefits remains until the week after normal production is restored.

The employer asserts the ineligibility provision of section 7(d) should be interpreted and applied as it has been by English authorities. The Director of Labor and the claimants counter, saying that section 7 (d) differs materially from section 26(1) of the English Unemployment Insurance Act, indicating an intent by our legislature to

accomplish a result other than the one reached under the English act. Where a statute is adopted from another State or country, the judicial construction previously placed on the statute by the courts of that State or country accompanies it and is treated as incorporated therein. (*American Steel Foundries* v. *Industrial Com.* 361 Ill. 582; *People* v. *Linn*, 357 Ill. 220.) Section 26(1) of the English Unemployment Compensation Act (25 Geo. V, chap. 8, 26-(1) (1935); 10 and 11 Geo. V, chap. 30, 8-(1) (1920),) so far as relevant, provides: "An insured contributor who has lost employment by reason of a stoppage of work which was due to a trade dispute at the factory, workshop, or premises at which he was employed, should be disqualified for receiving benefits so long as the stoppage of work continues." A like provision is in the 1946 Act, 9 and 10 Geo. VI, chap. 67, 13-(1). In *Saunders* v. *Maryland Unemployment Compensation Board*, 53 Atl. 2d 579, the Court of Appeals of Maryland, contrasting the Maryland statute with the English act, said, "The exception in the English statutes [citations] is practically identical with our statute." The Maryland act is, in turn, practically identical with the Illinois act. *Carnegie-Illinois Steel Corp.* v. *Review Board*, 177 Ind. App. 379, 72 N.E. 2d 662, refers to the fact that many States have passed statutes providing for unemployment benefits, some of which are patterned after the English statute. The expression "so long as the stoppage of work continues" does not appear in section 7(d) of our act but, up to this point, the two statutes are to the same effect. Had the words last quoted been added to section 7(d) they would have been redundant. In like manner, addition of the words "for any week" to the English statutory provision would have produced a redundancy. The words "so long as the stoppage of work continues" in the English act and the words "for any week" in the Illinois statute are substantially equivalent, merely designating the period during which the disqualification for

benefits runs. Without the quoted words, the respective statutes would provide no measure of time of disqualification. Again, the words "for any week" and, indeed, the entire paragraph (d) contrast the period of disqualification there described with specific periods in paragraphs (a), (b) and (c) of section 7.

In Halsbury's Laws of England (2d ed.), vol. 34, are noted the administrative decisions of the English umpires who administer the English Unemployment Compensation Act and whose decisions construing the quoted provisions from the English act are final because there is no provision for judicial review. Upon the question of when a stoppage of work is due to a labor dispute, these decisions (pp. 521-522) hold: "A stoppage is not necessarily limited in its duration by the duration of the dispute (Umpire's Decisions, 801, 8731). If the dispute is settled the stoppage due to that dispute ends when there is a general resumption of work (Umpire's Decision 4665/1926) * * * A stoppage may have ended, although the dispute is unsettled, when there has been a general return to work (Umpire's Decision 4665/1926). Even when the dispute is settled and the parties are willing to resume work, the stoppage may continue when it is not possible to resume work owing to the effects of the stoppage and dispute, *e.g.,* because of the necessity of reheating furnaces and ovens (Umpire's Decision 1188); or explosions of mines, gas; subsidences, floods, etc., in a mine owing to the withdrawal of safety men or other workers (Umpire's Decisions 801, 1022, 1395); * * *. The stoppage due to the dispute ceases when, although work is not resumed, the non-resumption is due to causes other than the trade dispute which was the original cause of the stoppage."

A conflict of authority obtains in judicial and administrative decisions in other States upon the precise issue considered and decided here. We deem it sufficient to observe that rulings of administrative agencies upon sim-

ilar acts containing similar words, although persuasive, are not binding or controlling upon the courts. *Grant Contracting Co.* v. *Murphy,* 387 Ill. 137; *Oak Woods Cemetery Ass'n* v. *Murphy,* 383 Ill. 301.

We are of the opinion that our conclusion not only renders effective the intention of the legislature but is a common-sense construction of the statute. Our decision rests upon the relatively plain and unambiguous language employed in section 7(d) without resort to the rule of statutory construction applicable to statutes adopted from another State or country. A statute itself affords the best means of its exposition, and if the legislative intent can be ascertained from its provisions, as here, this intent will prevail without resorting to other aids for construction. (*Burke* v. *Industrial Com.* 368 Ill. 554; *Schoellkopf* v. *DeVry,* 366 Ill. 39.) Courts have no legislative powers and may not incorporate in a statute provisions not within the intention of the General Assembly as expressed in the statute itself. (*First Nat. Bank* v. *Hahnemann Institutions,* 356 Ill. 366.) Had the General Assembly intended that a labor dispute or strike and the resulting stoppage of work be contemporaneous at all times in order to disqualify a claimant for unemployment compensation benefits, appropriate language to accomplish this purpose undoubtedly would have been incorporated in section 7(d).

Manifestly, had it not been for the strike or labor dispute ending March 6, 1946, the work stoppage commencing March 7 would not have resulted. An employer desirous of immediately resuming full-scale operation of its two plants was unable to afford employment to employees willing to return to work when the strike terminated. Both employees and employer were frustrated because two weeks were necessary to heat furnaces, recondition equipment in the plant generally, and to bring the employees back and organize them for the opening of the plants and resumption of their normal operations. The loss of time in opera-

tion and the efforts and expense incident to opening, closing and maintenance were the result of the strike. Under these circumstances, the work stoppages from March 7 to 21, 1946, existed and were due proximately to the strike or labor dispute at the plants at Granite City and East St. Louis. This being so, claimants were ineligible to benefits under section 7 (d) of the Unemployment Compensation Act.

The judgments of the circuit courts of Madison and St. Clair counties are reversed and the causes remanded, with directions to proceed in accordance with the views expressed in this opinion.

*Reversed and remanded, with directions.*